[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court is an arbitrator's reinstatement of an employee who was terminated by his employer for making a series of threats of violence and intimidation directed at his supervisors during an unexplained eight month absence from work. Plaintiff Catholic Cemeteries has filed a Motion to Vacate the Arbitration Award reinstating grievant employee Norman Roberts to his position as foreman mechanic. Defendant Rhode Island Laborers District Council objects to Plaintiff's Motion and moves to confirm the Arbitration Award. Jurisdiction is pursuant to R.I.G.L. 1956 § 28-9-18.
 FACTS AND TRAVEL
Catholic Cemeteries, of the Catholic Diocese of Providence (hereinafter "Plaintiff"), entered into a Collective Bargaining Agreement (hereinafter "CBA") with Rhode Island Laborers District Council on behalf of Local Union 271 (hereinafter "Defendant").
The grievant employee, Norman Roberts (hereinafter "Mr. Roberts") was hired by the Plaintiff as a mechanic on October 30, 1989. Mr. Roberts became a mechanic foreman on or about October 1999 and continued as a mechanic foreman until he voluntarily left on or about April 2, 2002.
 Workers' Compensation Claims
On July 5, 2001 Mr. Roberts sustained an injury while in the employ of the Plaintiff at the "Gate of Heaven Cemetery." Mr. Roberts applied for and received workers' compensation benefits from October 17, 2001 through December 11, 2001. Mr. Roberts was released to return to work, with no restrictions, on December 11, 2001 by Dr. Arnold C. Weiss, his treating physician. Mr. Roberts was immediately reinstated to his former position with the Plaintiff.
On April 2, 2002, Mr. Roberts again claimed that he sustained a work related injury which caused incapacity from April 2, 2002 through March 26, 2003. No medical records of treatment were produced to document the alleged injury. On March 31, 2004, a claim was made to the Workers' Compensation Court regarding the alleged injury. This claim for workers' compensation benefits was denied and is on appeal.
On May 2, 2003, Mr. Roberts filed a Petition to Review/Amend with the Workers' Compensation Court seeking to establish his total incapacity resulting from right carpal tunnel surgery was related to his July 2001 injury. The Petition was granted and Mr. Roberts received workers' compensation benefits for the period beginning March 27, 2003 through April 30, 2003. Thereafter, Mr. Roberts did not seek to return to his employment with the Plaintiff until almost 8 months after the last date of incapacity under his workers' compensation claim.
On December 17, 2003, Mr. Roberts attempted to return to work at the Gate of Heaven Cemetery. He did not present a physician's certificate authorizing a return to work and, there was no pending workers' compensation claim at that time. Mr. Roberts was informed that he had been terminated from his position as a result of his prolonged, unexplained absence from work and his threats of violence in the workplace.
 Theft Investigation
On March 20, 2003 Mr. Roberts voluntarily participated in an interview conducted by an audit firm retained by Plaintiff to investigate discrepancies with the inventory and equipment in the mechanics department of the Gate of Heaven Cemetery. In order to investigate and gather information, the auditors wanted to interview those who had worked in the mechanics department. Mr. Roberts was interviewed because he had knowledge regarding procedures and inventory within the repair shop having worked both as a mechanic and as a foreman for the Gate of Heaven Cemetery. During the interview, Mr. Roberts made certain threats against Father Anthony Verdelotti, Director of the Catholic Cemeteries, and Joseph Cavallaro, a superintendent at Gate of Heaven Cemetery at the time, that if they were present, he would shoot them. He further stated after a reference to hunting that "they should throw them out into the woods, too." The threats were reported to the Diocese and a determination was made by the Diocese that no action would be taken against Mr. Roberts because he was not considered an employee of the Diocese at the time.
During the arbitration hearing regarding Mr. Roberts' termination, Arthur Lurgio, Associate Director of Catholic Cemeteries, testified that during the interview with the auditors, Mr. Roberts ". . . appeared to be agitated and made a statement to the effect that, if Father Verdelotti and Joseph Cavallaro, who was a superintendent at Gate of Heaven Cemetery at the time, were there, he would kill them, or shoot them, something to that effect." (Tr. At 28, 29)
On April 3, 2003 in a telephone conversation with Cheryl Accino, Office Operations Coordinator for the Plaintiff, Mr. Roberts again made threatening remarks towards Father Verdelotti. Ms. Accino testified that on April 3, 2003 in a conversation that she had with the grievant, he informed her that he was upset with the audit interview and that "he hadn't taken his guns out yet, but that if he did he couldn't be held liable due to the medications he was on. The threats were reported to Mr. Arthur Lurgio and the Human Resource Manager Bill Meyer. Ms. Accino gave her testimony under oath and was subject to cross-examination. The arbitrator found Ms. Accino's testimony concerning her conversation with the grievant on April 3, 2003 to be credible.
In Ms. Accino's notes taken of her April 3, 2003 telephone conversation with the grievant, she indicated that the grievant informed her that Father Verdelotti was "a sneaky boss" and stated that "I'm on so many pills for pain, and I'm not a sane man." According to her notes, Mr. Roberts also said to her, "I haven't taken any guns out yet to hunt anyone down." The arbitrator found Ms. Accino's testimony and her notes of the grievant's statement during the April 3, 2003 discussion were similar to the grievant's comments that he made to the auditor.
It was again determined that Mr. Roberts could not be internally disciplined because he was not an employee at that time, as Mr. Roberts had neither timely pursued a workers' compensation claim, nor sought reinstatement for any justified absence from work.
 Termination and Ensuing Arbitration
The Defendant wrote to the Plaintiff on December 31, 2003 asking for a reason for Mr. Roberts' termination. This letter was a result of Mr. Roberts' appearance on December 17, 2003 at the Gate of Heaven Cemetery and his request for re-employment which was not granted.
The Plaintiff, through its Counsel, wrote to the Defendant on January 7, 2004 stating that "Mr. Roberts is not entitled to a right of reinstatement pursuant to the Workers' Compensation Act and Mr. Roberts violated his employer's violence in the workplace policy. Therefore, our client considers Mr. Roberts a terminated employee."
Thereafter, the Defendant demanded arbitration through the arbitration provisions of the CBA between the parties. Defendant's demand for arbitration is dated February 13, 2004 and asserts that his employer violated the CBA by terminating him without cause. Defendant sought reinstatement to his original position and to be made whole of all remedies including attorney and court costs.
The arbitrator heard testimony over a two day period. Plaintiff filed a motion to dismiss claiming substantive non-arbitrability in that all rights and remedies including reinstatement were exclusively within the province of the Workers' Compensation statutory scheme. Regarding the legal argument made, Plaintiff filed a motion to dismiss challenging the subject matter jurisdiction of the arbitrator to decide the right to reinstatement. On August 6, 2004, the arbitrator issued an interim award denying the motion to dismiss and ruling that the grievance submitted was substantively arbitrable and that the arbitrator had the authority to determine Mr. Roberts' right of reinstatement under the CBA. On August 10, 2004, Plaintiff renewed its motion to dismiss which was denied by the arbitrator.
On November 5, 2004, the arbitrator issued an award finding that Mr. Roberts was terminated in violation of the CBA as there was "no cause" established to justify the termination. The arbitrator awarded reinstatement effective December 17, 2003. Mr. Roberts was thus reinstated to his position as a mechanic foreman.
 STANDARD OF REVIEW
Section 28-9-18 of the Rhode Island General Laws governs the vacating of arbitration awards. That statute provides in pertinent part:
 "(a) In any of the following cases the court must make an order vacating the award, upon the application of any party to the controversy which was arbitrated:
(1) When the award was procured by fraud.
 (2) Where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.
 (3) If there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28-9-13.
 (b) A motion to vacate, modify, or correct an arbitrator's award shall not be entertained by the court unless the award is first implemented by the party seeking its vacation, modification, or correction; provided, the court, upon sufficient cause shown, may order the stay of the award or any part of it upon circumstances and conditions which it may prescribe.
 (c) If the motion to vacate, modify, or correct an arbitrator's award is denied, the moving party shall pay the costs and reasonable attorneys' fees of the prevailing party."
An arbitration award should be vacated if the arbitrator has exceeded his or her powers in making the award. See Rhode Island Brotherhood ofCorrectional Officers v. State Department of Corrections, 707 A.2d 1229,1234 (R.I. 1998). The award will be deemed ultra vires if it did not `draw its essence' from the agreement, if it was not based upon a `passably plausible' interpretation thereof, if it manifestly disregarded a contractual provision, or if it reached an irrational result. Id.
 ARBITRABILITY
First, Plaintiff argues that the arbitrator exceeded his powers in rendering an award for Mr. Roberts because the Workers' Compensation Court has exclusive jurisdiction to determine reinstatement of an employee following a workers' compensation injury. Thus, it is Plaintiff's contention that the arbitrator has no subject matter jurisdiction under the CBA because the issue of reinstatement was non-arbitrable. In support of its position, Plaintiff cites G.L. 1956 §28-33-47, the statute governing the reinstatement of injured workers. Plaintiff claims that under § 28-33-47, the employee must initiate a petition seeking reinstatement under the Workers' Compensation Act if the employee feels that he or she has been wrongfully denied reinstatement following a workers' compensation injury. Plaintiff argues that because Mr. Roberts never filed a written demand for reinstatement, his right to reinstatement terminated for failing to comply with the time parameters set forth in subsection (c) of the statute.
Our Supreme Court has repeatedly held that when the language of a statute is clear and unambiguous, the Court must enforce the statute as written by giving the words of the statute their plain and ordinary meaning. See Gem Plumbing Heating Co. v. Rossi, 867 A.2d 796 (R.I. 2005). Subsection (c)(1)(v) of § 28-33-47 provides as follows:
"(c) Notwithstanding subsection (a) of this section:
 (1) The right to reinstatement to the worker's former position under this section terminates upon any of the following:
. . .
 (v) The expiration of ten (10) days from the date that the worker is notified by the insurer or self-insured employer by mail at the address to which the weekly compensation benefits are mailed that the worker's treating physician has released the worker for employment unless the worker requests reinstatement within that time period"
In this case, it is undisputed that the grievant failed to adhere to the time constraints set forth in the statute. Therefore, it is clear to this Court that the grievant's only remedy was to seek relief from the Workers' Compensation Court.
Moreover, this Court finds the Union's and the arbitrator's reliance on subsection (b) of § 28-33-47
unpersuasive. That section provides that "[t]he right of reinstatement shall be subject to the provisions for seniority rights and other employment restrictions contained in a valid collective bargaining agreement between the employer and a representative of the employer's employees . . ." The arbitrator interpreted subsection (b) to mean that a grievant's right to reinstatement based on a workers compensation claim shall be determined solely by the provisions of the collective bargaining agreement between the relevant parties. However, this Court finds that there is a significant difference between the phrase "shall be subject to" as used in subsection (b) of the statute and the phrase "determined by." While there can be no question that the instant grievance would have been arbitrable under the collective bargaining agreement had Mr. Roberts filed a timely request under the statute, subsection (b) does not exonerate an employee's duty to act within the time requirements set forth in the Workers' Compensation Act. Reading § 28-33-47 in its entirety, it is apparent to this Court that reinstatement of an injured worker is arbitrable under a collective bargaining agreement only if the grievant has followed the procedures set forth in the Workers' Compensation Act. Here, there was no right of reinstatement that could be subject to the terms of the collective bargaining agreement because any such right had already expired. Consequently, this Court finds that the arbitrator erred in finding that Mr. Roberts' grievance was arbitrable.
 UNEXPLAINED ABSENCE
Next, Plaintiff argues that the Court should vacate the arbitrator's award because the arbitrator manifestly disregarded the contractual provisions in the CBA and reached an irrational result. Plaintiff contends that the arbitrator acted irrationally in finding that Mr. Roberts did not abandon his job in April 2002, when it is clear that he never filed a claim with the Workers' Compensation Court in April 2002 and, failed to submit any documentation of his injury at that time, and simply decided not to come to work again until December of 2003. Furthermore, Plaintiff maintains that the arbitrator's determination that Defendant was wrongfully terminated is irrational in light of the fact that Mr. Roberts made repeated credible threats of violence regarding a superior.
In the present case, the arbitrator reasoned that Mr. Roberts did not abandon his job in April of 2002 because he was seeking workers compensation benefits at the time he left his employment. In reaching this decision, the arbitrator ignored the fact that when Mr. Roberts left his employment in April of 2002 there was no open or pending claim with the Workers' Compensation Court and Mr. Roberts had not provided any documentation of his injury. In support of his decision, the arbitrator noted that as of May 2, 2003, Mr. Roberts was considered an employee for workers' compensation and contract purposes. However, it is undisputed that the worker's compensation claim at issue as of May 2, 2003 only covered the period from March 27, 2003 through April 30, 2003 and was to account for a month of total incapacity resulting from Mr. Roberts' original injury in July 2001, when he was an employee. Moreover, it is uncontested that Mr. Roberts did not seek reinstatement when his workers' compensation benefits ended on April 30, 2003.
While it was clearly reasonable for Mr. Roberts to remain out of work when he was receiving worker's compensation benefits for a proven injury, this Court finds Mr. Roberts' decision to leave his employment in April 2002 without permission or explanation unjustifiable. Additionally, if Mr. Roberts did consider himself to be an employee of Gate of Heaven Cemetery after he left in 2002, his subsequent actions were not demonstrative of that belief. When Mr. Roberts attempted to return to work at the Gate of Heaven Cemetery on December 17, 2003, there was no pending workers' compensation claim and he did not present a physician's certificate authorizing a return to his regular employment or suitable employment. Additionally, there was no evidence that the grievant was in an approved program of rehabilitation. It is only logical to conclude that an employee has voluntarily quit if he does not return to his place of employment for a period of eight months and has neglected to file any documents which could potentially excuse such an extended absence from work. Thus, it is clear to this Court that the Plaintiff was justified in concluding that Mr. Roberts voluntarily quit his position as mechanic foreman when Mr. Roberts left his job in April of 2003 and did not seek to return until eight months later. Moreover, this Court finds that Plaintiff had no duty under the collective bargaining agreement to rehire Mr. Roberts when he inexplicably showed up on December 17, 2003 seeking employment with the Plaintiff.
 THREATS OF VIOLENCE
Furthermore, even if this Court were to find that Mr. Roberts did not abandon his employment, it is apparent to this Court that Mr. Roberts' threats of violence to his superiors, standing alone, provided a sufficient basis for Plaintiff's termination of Mr. Roberts. While acknowledging the inappropriateness of Mr. Roberts' threats, the arbitrator concluded that termination was too harsh a form of discipline for Mr. Roberts' misconduct. In reaching his decision, the arbitrator cited the lack of a written policy regarding violence in the workplace. The Arbitrator held that "The Grievant could not have been on notice by the Employer of such a so called `zero tolerance policy' regarding workplace violence because none was ever enacted and distributed to the employees of the Union. Therefore, the employer's termination of the Grievant for violation of a nonexistent policy is severely undermined." The arbitrator further noted that "The Grievant did not receive any warnings or other discipline immediately following his March or April 2003 statements."
This Court finds the arbitrator's reasoning irrational in light of the substantial evidence presented at the hearing attesting to the serious nature of Mr. Roberts' threats towards Father Verdelotti. At the hearing, Ms. Accino testified that she received a telephone call from Mr. Roberts on Thursday, April 3, 2003 during which Mr. Roberts told Ms. Accino "I haven't taken any guns out yet to hunt anyone down." Ms. Accino further stated that Mr. Roberts told her that he hadn't yet taken his guns out "but if he did he couldn't be held liable due to the medications he was on." During cross-examination, Ms. Accino testified that she was fearful for Father Verdelotti because that was the person to whom Mr. Roberts' threats were directed. She went on to state that Mr. Roberts told her that Father Verdelotti was a sneaky boss and that he would not be held responsible for his actions. Furthermore, at the hearing Mr. Roberts testified that during the interview with the auditors, he specifically mentioned Father Verdelotti's name and Joseph Cavallaro's name in direct reference to hunting and stated "they should throw them out into the woods too."
It is clear to this Court that Mr. Roberts should have known that making serious threats directed at one's employer constitutes severe misconduct warranting discharge, with or without the existence of a written workplace policy against violence. The Rhode Island Supreme Court has recently recognized that the absence of a specific policy prohibiting certain workplace misconduct does not bar an employer from imposing discipline, including termination upon an employee.
In State of Rhode Island, Department of Correctionsv. Rhode Island Brotherhood of Correctional Officers,867 A.2d 823 (R.I. 2005), the Supreme Court affirmed the termination of a DOC employee who removed state property from a correctional facility, observing:
 "The towels and linens clearly were state property regardless of how [the employee] obtained possession of them. The fact that the DOC lacked a specific policy prohibiting the use of MHRH linens does not equate with permission to remove the property from departmental premises. Furthermore, the fact that DOC employees may have considered the towels to be of little value is irrelevant." Id.
It is indisputable that threats of workplace violence or intimidation are significantly more egregious than unauthorized removal of state property. The conduct in both situations, however, is similar in that it is the type of obvious workplace misconduct in which "common-sense" rather than an explicit written policy is the only knowledge needed to understand that such conduct is unacceptable. Guided by the Supreme Court's decision in Rhode Island Brotherhood of Correctional Officers,
this Court finds that threatening to shoot one's employer and threats designed to intimidate or incite fear in the workplace are so menacing and inappropriate that they need not be spelled out in a workplace policy for a reasonable employee to understand that such actions are cause for termination. Moreover, the Preamble to the CBA recognizes the unique character of the employment relationship at the Catholic Cemeteries and states:
 "It is recognized by both parties to this AGREEMENT that the character of Catholic Cemeteries is RELIGIOUS and that they are dedicated to the worship of God, in accordance with the Rites and Rituals of the Roman Catholic Church."
Clearly in this type of environment employees are expected to adhere to high standards of decorum, language and conduct.
This Court is mystified by the arbitrator's reliance on the lack of the grievant's knowledge of a "zero tolerance policy" regarding workplace violence in attempting to reinstate Mr. Roberts. In his decision, the arbitrator wrote:
 "An important component of the cause standard is notice to employees of proscribed workplace behavior, and of the penalties for violation of specified prohibitions. A workplace violence policy, where it exists, accomplishes such objectives. However, in the instant case, the grievant could not have been on notice by the Employer of such a so-called `zero tolerance policy' regarding workplace violence because none was ever enacted and distributed to the employees or to the Union."
This analysis is misdirected. This is not a case of an employee simply expressing some sudden anger or emotion of a generic nature while working. Rather, the threats of violence and intimidation by Mr. Roberts were directed at specific individuals and made in the course of a lawful investigation of the disappearance of cemetery property
There is ample support for the proposition that "[t]hreatening a fellow employee may be grounds for discharge" and that "[t]hreatening a fellow employee with a deadly weapon is especially serious." 9 Labor and Employment Arbitration § 235.03 at 235-16 (Tim Bornstein et. al. eds., 2004). There is no need for a "zero tolerance policy" before an employer can impose discipline or discharge an employee for making threats directed toward his fellow employees. See id. Additionally, threats made deliberately with the intent to intimidate fellow employees may be more serious than spontaneous outbursts resulting from provocation. Id. The threats made by the grievant in this case were particularly serious because they were not made in the heat of anger but rather were made by the grievant at several stages of an ongoing investigation. Moreover, lack of intention to carry out a threat is not a mitigating factor if it puts fellow employees in fear and creates an uncomfortable work atmosphere. See id. at 235-17. Arbitrators have upheld the discharge of employees for such threats even if the party making the threat had no intention of carrying the threat out. See id. The nature and seriousness of the threats in this case — involving the use of firearms against a supervisor — must be evaluated for the effect of the remark on the recipient. Even if Mr. Roberts did not intend the threatening statements to be taken seriously, the effect on the targets of his threats was clearly fear and intimidation.
Applying the above mentioned principles, this Court is disturbed by the arbitrator's rigid application of the legal definition of a threat[1]
and the following analysis:
 "I do not find that the grievant's statement to the arbitrator rises to the level of a threat because it does not manifest the requisite intent to inflict physical harm on an individual." (Arbitration Decision at 12).
This Court refuses to endorse this arbitrator's "ostrich" mentality towards dangerous and abusive workplace behavior whereby serious threats of violence or intimidation are minimized or ignored rather than dealt with decisively before a tragedy occurs.
This Court also rejects the arbitrator's reliance on progressive discipline to buttress his decision to reinstate Mr. Roberts since the CBA between the parties contains no progressive discipline clause. To the extent that the arbitrator fortified his reasoning for reinstatement on a non-existent contract provision his analysis is undermined and supports a finding that his decision fails to draw its essence from the CBA.
 CONCLUSION
The arbitrator's analysis ignores the obvious — violence in the workplace is an ever increasing occurrence that creates serious safety and health issues for employers. His analysis also ignores the reality that workplace anger and violence is often ignored by employers who fail to take appropriate steps to defuse potential violence before it erupts. The evidence before this arbitrator was that Mr. Roberts' threats created fear and concern for the safety of others. This Court can find no rationality in a decision that seeks to protect a threatening and intimidating employee in the workplace while requiring the recipients of such conduct and others in the workplace to work in fear or under intimidating circumstances.
For the reasons stated above, this Court finds that this matter was non-arbitrable and that the arbitrator's decision to reinstate Mr. Roberts in his position as foreman mechanic for Gate of Heaven Cemetery was irrational and did not draw its essence from the collective bargaining agreement. Accordingly, this Court hereby vacates the arbitrator's award and holds that Mr. Roberts' employer/employee relationship with Plaintiff ended when he voluntarily abandoned his position as mechanic for Gate of Heaven Cemetery.
Council shall present the appropriate judgment for entry.
[1] Curiously, this arbitrator's definition of a threat in this Rhode Island arbitration cites legal authority from Minnesota and Louisiana.